**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN J. CARNEY, in his capacity as Court-Appointed Receiver for Michael Kenwood Group, LLC, et al., | |
| | Civil Action No. |
| Plaintiff, | |
| v. | |
| HORION INVESTMENTS LTD., ROMEO MOUAWAD MOUAWAD, JESPA MAWAD DE MOUAWAD, TANIA MOUAWAD MAWAD, and MIGUEL ANTONIO MOUAWAD MAWAD, | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | May 8, 2013 |

## COMPLAINT

John J. Carney, Esq. (the "Receiver"),[1] as Receiver for Michael Kenwood Group LLC

(the "MK Group") and certain affiliated entities (the "Receivership Entities") in *Securities and*

*Exchange Commission v. Illarramendi, Michael Kenwood Capital Management, LLC et al.*, No.

3:11-cv-00078 (JBA) (the "SEC Action"), by and through his undersigned counsel, alleges the

following:

---

[1] Unless otherwise explicitly defined herein, the Receiver adopts for purposes of this complaint the defined terms as set forth in the Amended and Restated Receiver Order (the "Receiver Order") dated March 1, 2013 (SEC Action, Dkt. 666).

## SUMMARY OF CLAIMS

1.      This lawsuit is part of the Receiver's continuing efforts to trace, recapture and return investor proceeds stolen from investment funds managed and operated as a Ponzi scheme by Francisco Illarramendi ("Illarramendi") and other individuals affiliated with the MK Group and Highview Point Partners, LLC ("HVP Partners") (the "Fraudulent Scheme"). Illarramendi directed substantial payments of Receivership Estate assets, directly and indirectly, to or for the benefit of Defendants (collectively, the "Transfers"). The Transfers, set forth on Exhibit A attached hereto, total at least $28,505,425 and comprise investor proceeds and other monies that must be recovered for distribution to Illarramendi's victims and creditors.

2.      Upon information and belief, Illarramendi completely ignored various corporate formalities by directing transfers from various Receivership Entities to Defendants without regard to whether Defendants had provided value to the Receivership Entities.

## RELEVANT RECEIVERSHIP ENTITIES

3.      **Michael Kenwood Venezuela** ("MKV," together with Short Term Liquidity Fund, I, Ltd. and MK Special Opportunities Fund Ltd., the "MK Funds") is a fund registered in the Cayman Islands. MKV was formed on August 14, 2008, with the purpose of investing in the Bolivarian Republic of Venezuela ("Venezuela") credit spectrum including arbitrage between the Venezuela Bolivar (VEF) and the US dollar (USD), as well as high returns currently being offered by Venezuelan USD international bonds. Its office and principal place of business was located in Stamford, Connecticut.

4.      **Highview Point Partners, LLC** ("HVP Partners") is a Delaware limited liability company organized on August 27, 2004. HVP Partners was founded by Illarramendi and two other individuals and managed the Highview Point Master Fund Ltd. (the "Master Fund") and two feeder funds, Highview Point Offshore, Ltd. ("HVP Offshore") and Highview Point LP

("HVP LP") (collectively, the "HVP Funds"). Its office and principal place of business was located in Stamford, Connecticut.

## CRIMINAL PROCEEDING

5.      On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut filed a Criminal Information (the "Information") against Illarramendi alleging that Illarramendi, with others, had engaged in a massive Ponzi scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors.

6.      According to the Information, Illarramendi engaged in or caused multiple acts in furtherance of the Ponzi scheme, including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the Securities and Exchange Commission ("SEC"), and others to conceal and continue the scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions without documentation in an effort to conceal and continue the scheme; (4) transferring millions of dollars of assets across the Receivership Entities and other entities he controlled to make investments in private equity companies; and (5) commingling assets across the Receivership Entities and other affiliated entities.

7.      On March 7, 2011, Illarramendi pleaded guilty to a much larger fraud than was originally alleged in the SEC Action. He pleaded guilty to felony violations of wire fraud (18 U.S.C. § 1343), securities fraud (15 U.S.C. §§ 78j(b) and 78ff), investment adviser fraud (15 U.S.C. §§ 80b-6 and 80b-17) and conspiracy to obstruct justice (18 U.S.C. § 371).

8.      As Illarramendi publicly acknowledged during his plea allocution he began engaging in this scheme years earlier to conceal from investors and creditors losses of several hundred million dollars. Illarramendi admitted as part of his plea agreement to operating the

hedge funds he managed as a Ponzi scheme in which he used money provided by new investors to payout returns he had previously promised to old investors. *See United States v. Illarramendi*, No. 3:11-cr-00041-SRU (Docket No. 10).

9.     Illarramendi is currently detained at the Donald W. Wyatt Detention Institution in Rhode Island pending sentencing, which is currently scheduled for May 29, 2013.

## THE DEFENDANTS

10.     **Horion Investment Ltd.** ("Horion") was formed in the British Virgin Islands on or about April 22, 2009. After its formation, Defendants Romeo Mouawad, Jespa Mouawad, Tania Mouawad, and Miguel Mouawad (the "Mouawad Family") were granted Power of Attorney to act on behalf of Horion. Upon information and belief, Horion was a shell corporation formed by the Mouawad Family for the sole purpose of engaging in transactions with and receiving transfers from the Receivership Entities, as it was formed approximately two weeks before receiving the first Transfer alleged herein, and appears to have been inactive since 2011. Upon information and belief, at all times relevant to the complaint, Horion has been completely dominated and controlled by Romeo Mouawad, Jespa Mouawad, Tania Mouawad, and Miguel Mouawad, with the result that Horion and the Mouawad family are effectively one and the same, and the corporate form should be disregarded.

11.     **Romeo Mikael Mouawad Mouawad** ("Romeo Mouawad") is a Venezuelan citizen of Lebanese descent and a wealthy financier who operates an international brokerage firm and maintains significant political connections in Venezuela. Upon information and belief, Romeo Mouawad achieved significant financial success during the early years of Hugo Chavez's administration and maintains connections with high ranking officials who formerly served under Chavez.

12.     Romeo Mouawad maintains residences in Miami and Miami Beach, Florida where he routinely lives for months at a time, has maintained a residence in Florida at all relevant times to this complaint, and regularly conducts business in the United States. Upon information and belief, Romeo Mouawad owns and controls, in whole or in part, Defendant Horion. Romeo Mouawad is a direct beneficiary of transfers from the Receivership Entities.

13.     **Jespa Mawad De Mouawad** ("Jespa Mouawad") is, upon information and belief, Romeo Mouawad's wife. She maintains residences in Miami and Miami Beach, Florida where she routinely lives for months at a time, has maintained a residence in Florida at all relevant times to this complaint, and regularly conducts business in Florida. Jespa Mouawad has Power of Attorney to act on behalf of Horion. Upon information and belief, Jespa Mouawad is a direct beneficiary of transfers from the Receivership Entities.

14.     **Tania Mouawad Mawad** ("Tania Mouawad") is, upon information and belief, Romeo Mouawad's daughter. She maintains residences in Miami and Miami Beach, Florida where she routinely lives for months at a time and has maintained a residence in Florida at all relevant times to this complaint. Tania Mouawad has Power of Attorney to act on behalf of Horion. Upon information and belief, Tania Mouawad is a direct beneficiary of transfers from the Receivership Entities.

15.     **Miguel Antonio Mouawad Mawad** ("Miguel Mouawad") is, upon information and belief, Romeo Mouawad's son. He maintains multiple residences in Miami and Miami Beach, Florida where he routinely lives for months at a time, has maintained a residence in Florida at all relevant times to this complaint, and regularly conducts business in the United States. Further, Miguel Mouawad has been issued a United States social security number, maintains an active Florida motor vehicle registration, and has participated in amateur

motorsports racing. As recently as March 2013, Miguel Mouawad also owned a condominium in New York City. Upon information and belief, Miguel Mouawad is a direct beneficiary of transfers from the Receivership Entities.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367 in that this is an action brought by the Receiver appointed by this Court concerning property under this Court's exclusive jurisdiction. *See* Receiver Order.

17.     This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §§ 754 and 1692 and under applicable state law.

18.     The District of Connecticut is the appropriate venue for any claims brought by the Receiver pursuant to 28 U.S.C. § 754 as the acts and transfers alleged herein occurred in the District.

## RECEIVER'S STANDING

19.     On January 14, 2011, the SEC commenced a civil enforcement action against Illarramendi, MK Capital, and various relief defendants (the "SEC Defendants"). The SEC's complaint alleges that Illarramendi and others misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder. The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

20.     Simultaneously with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the SEC Defendants. The SEC also sought the appointment of a receiver over those assets.

21.     On February 3, 2011, the Court appointed Plaintiff John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant MK Capital and

various relief defendants. An Amended Receiver Order was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of the Receivership Estate to include the MK Funds.

22.    The most recent Receiver Order, entered on March 1, 2013, further expanded the Receivership to include, *inter alia*, the HVP Funds.

23.    Pursuant to the Receiver Order, the Receiver has the duty of, among other things, identifying and recovering property of the Receivership Entities to ensure the maximum distribution to the Receivership Entities' defrauded creditors and to maximize the pool of assets available for distribution. Pursuant to the Receiver Order, the Receiver must take control of all assets owned by or traceable to the Receivership Estate, including any funds that were stolen, misappropriated, or fraudulently transferred as alleged herein.

24.    The Receiver Order grants the Receiver authority to bring, among other things, claims that the Receivership Entities could have brought on their own behalf. This includes, among other things, the right to "seek . . . avoidance of fraudulent transfers" (Dkt. 666 at ¶ 48) and "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver" (*Id.* at ¶13.I) on behalf of the Receivership Entities and for the ultimate benefit of their creditors.

25.    At all relevant times, the Receivership Entities were under Illarramendi's control and dominion as Illarramendi and his accomplices diverted their corporate assets and deepened their insolvency in furtherance of the Fraudulent Scheme.

26.    The Fraudulent Scheme and, specifically, Defendants' receipt of fraudulent transfers and other payments originating from the fraud, caused harm to the Receivership Entities' business and property. Pursuant to the Receiver Order, the Receiver has standing to

bring the claims alleged herein. Because the Receivership Entities were under Illarramendi's domination and control while Illarramendi diverted their assets, causing them harm, the Receivership Entities are tort creditors of Illarramendi.

27.     The Receiver has standing to bring these claims pursuant to, among other things, Connecticut Uniform Fraudulent Transfer Act ("CUFTA"), CONN. GEN. STAT. § 55-552, and Connecticut common law.

28.     As alleged herein, at all relevant times, the Receivership Entities were creditors of Illarramendi because they each had a claim to the funds that Illarramendi diverted and misappropriated in furtherance of the Fraudulent Scheme. Because Illarramendi routinely commingled funds between and among Receivership Entities, each such entity is a creditor of one another. Accordingly, the Receiver has standing to avoid and recover the Transfers made to Defendants.

## THE FRAUDULENT SCHEME

**Illarramendi's Network of Entities and Funds**

29.     The Fraudulent Scheme at the center of this action involves the misappropriation and misuse of investor assets by Illarramendi through his domination and control over two Stamford, Connecticut-based investment advisers—namely, HVP Partners and MK Capital.

30.     To perpetrate and prolong the Fraudulent Scheme, Illarramendi fabricated entire transactions and manipulated actual transactions in an effort to conceal the Fraudulent Scheme and defraud creditors. To hide the ever-growing shortfall, Illarramendi played a shell game with the remaining investor funds, constantly shuffling funds from one entity or fund to the next, pervasively commingling, misappropriating and looting funds and giving the false appearance of profitability. Illarramendi showed no regard whatsoever for corporate form or formalities while operating the Receivership Entities.

31.     Illarramendi was the managing member and one-third owner of HVP Partners, which he co-founded with Christopher Luth and Frank Lopez in 2004. Beginning in or about 2006, Illarramendi was also the majority owner of and control person for a group of affiliated entities, the MK Entities, which would eventually become organized as the MK Group.

32.     In blatant disregard for his duties as a fiduciary, both to the funds he managed and to investors, Illarramendi not only used money provided by new investors to pay the returns he promised to earlier investors, but he also: (a) created fraudulent documents to mislead and deceive investors, creditors, and the SEC about the existence and amount of the HVP and MK Funds' assets; (b) made false representations to investors and creditors (and those of the HVP and MK Funds) in an effort to obtain new investments from them and to prevent them from seeking to liquidate their investments; (c) commingled the investments in each individual hedge fund with investments in the other hedge funds and other third parties without regard to their structure, stated purpose, or investment limitations; (d) engaged in transactions that were not in the best interests of the HVP and MK Funds and agreed to pay bribes and kickbacks to certain persons connected with those transactions; and (e) diverted funds for his own personal benefit. As a result of these fraudulent activities, Illarramendi left a gap between the liabilities owed to the HVP and MK Funds' investors and assets actually possessed by the HVP and MK Funds. In testimony before this Court, Illarramendi estimated that this gap exceeded $300 million.

33.     From at least 2005 through the fall of 2010, Illarramendi caused HVP Partners, the MK Group, the MK Funds, and the HVP Funds to engage in scores of extraordinarily complex and multi-layered transactions as part of the Fraudulent Scheme to conceal investment losses and misappropriated investor assets. Illarramendi conducted the fraud using the HVP Funds and the MK Funds in tandem, engaging in many related transactions between the two

groups, which included purported loans and investments, and extensive, undocumented transfers of cash between them for the purpose of concealing massive losses in order to hinder, delay or defraud the Receivership Entities and the HVP Funds, their investors and creditors. For example, at the end of 2010, the purported value of one of the MK Funds, STLF, was as high as $540 million. STLF was in fact insolvent, however, because many of its assets were used during 2010 to improperly pay redemptions to investors in MKV, other MK Funds, and other third parties.

34.     Illarramendi utterly disregarded the corporate form and formalities and separate identities of the MK Funds and the HVP Funds in carrying out the fraudulent scheme, and freely and indiscriminately commingled, misappropriated and looted investor proceeds to further the fraud and conceal it from investors and creditors.

**The Genesis of the Fraud**

35.     As noted above, in August 2004, Illarramendi and two others formed HVP Partners with each holding a one-third ownership share. According to the Limited Liability Corporation Agreement, the stated purpose of HVP Partners was to act as the investment manager of the Offshore Fund, a hedge fund to be nominally based in the Cayman Islands (in fact, the fund was completely dominated and controlled from its inception by Illarramendi through HVP Partners) and for engaging in any other lawful act or activity for which a limited liability company may be formed under the Delaware Limited Liability Company Act.

36.     In October of 2005, Illarramendi brokered a deal on behalf of the Offshore Fund and others to purchase and then immediately sell a Credit Lyonnais bond (the "Calyon Bond"). The Calyon Bond deal went awry from the beginning and generated losses which should have been disclosed to, and recognized by, the investors. Rather than disclose these losses, Illarramendi decided to fraudulently conceal them. Despite the fact that the Calyon Bond

transaction resulted in a loss, Illarramendi caused proceeds received in the transaction to be transferred to each investor, other than to the Offshore Fund, in amounts greater than each investor's initial investment. These transfers made it fraudulently appear that those investors had received profits from the transaction rather than sustaining a significant loss. This caused a substantial cash shortfall that was absorbed by the Offshore Fund and fraudulently concealed on the fund's books and records along with falsely reported profits to the Offshore Fund from the deal. The difference between the actual proceeds distributed to the Offshore Fund and what was fraudulently recorded on the funds' books and records was approximately $5.2 million, and was the beginning of the "hole." At the end of October 2005, this $5.2 million hole constituted roughly ten percent of the $52 million net asset value reported in the falsified books and records of the Offshore Fund.

37.     To cover up the $5.2 million shortfall or "hole," Illarramendi instructed GlobeOp, the HVP Funds' administrator, to record entries in the books and records of the Offshore Fund falsely reflecting that approximately $5.2 million in funds had been transferred to, and invested in Ontime Overseas Inc. ("Ontime"), an entity controlled by Illarramendi's brother-in-law, Rufino Gonzalez-Miranda. These falsifications of the books and records of the Offshore Fund made it appear that the Offshore Fund actually received a profit and caused the Offshore Fund's books and records to be fraudulently misstated. In reality, no proceeds of the Calyon Bond transaction were transferred to Ontime.

38.     This initial fraudulent concealment of the $5.2 million hole did not buy Illarramendi enough time to replace the missing funds. In order to ensure that the fraudulent transaction was removed from the books before the year-end audit, on or about December 15, 2005, Illarramendi arranged for Ontime to transfer $7.4 million to the Offshore Fund to make it

appear that the falsely recorded phony investment in Ontime was being "redeemed." In fact, no such investment had been made, and Ontime was merely serving as a shell to move funds at Illarramendi's command.

39.    To fund the fraudulent transfer from Ontime, which made it falsely appear that a redemption had occurred, Illarramendi, disregarding corporate form or conflicts of interest, transferred $5.5 million to Ontime from the Wachovia bank account of HVP Partners in several transactions in November and December. Further disregarding corporate form, Illarramendi caused HVP Partners to fund these fraudulent transfers primarily through a loan from BCT Bank International ("BCT Bank") to HVP Partners. The use of money provided by others to conceal the hole, for the most part enlarged it, as others required compensation for the use of the funds. Thus began a series of convoluted transactions over the next five years designed to hide the "hole."

40.    By January 2006, with over $72 million of assets in the Offshore Fund under the exclusive control of HVP Partners, the hedge fund's structure was changed to a "master-feeder" structure by creating the Master Fund, turning the Offshore Fund into an offshore feeder fund, HVP Offshore, and creating another entity, HVP LP, as a domestic feeder fund. As part of this change in structure, the Master Fund was incorporated in the Cayman Islands in January 2006. Again, absolute investment and contracting powers over the fund were handed to HVP Partners.

41.    The Fraudulent Scheme was overarching in nature and involved the massive commingling of funds and the operation and use of the HVP Funds and their bank accounts to facilitate the fraud. Corporate formalities were ignored and the monies invested in the HVP Funds, along with money from others, were used to engage in a huge Ponzi scheme. The Fraudulent Scheme culminated in losses of more than $300 million.

42.     As losses and costs of concealment at the HVP Funds became unmanageable and more difficult to hide, Illarramendi began, in 2007, to expand his fraudulent scheme by organizing the MK Entities and MK Funds to raise funds that would in large part be fraudulently transferred to, and commingled with, those of the HVP Funds. Using the MK Funds to raise capital to conceal if not plug the hole had obvious advantages for Illarramendi, because none of the MK Funds was registered with the SEC. Moreover, none of the MK Funds had internal controls that interfered with Illarramendi's misuse or misappropriation of money or other property to conceal and fill the hole at the HVP Funds. Illarramendi exploited these circumstances to loot and misappropriate investor monies from the MK Funds to conceal and fill the hole at the HVP Funds and thereby extend his fraudulent scheme. Upon information and belief, as described below, Defendants assisted Illarramendi in raising investments and received excessive and outlandish payments in return.

**"Off the Books" Bank Accounts**

43.     In order to fraudulently conceal the hole, perpetuate the Fraudulent Scheme, and engage in transactions that were not recorded in the books and records of HVP Partners and MK Capital, Illarramendi used various bank accounts, including accounts in the names of shell companies such as Naproad and HPA.

44.     At all relevant times, those bank accounts were under the control of Illarramendi and HVP Partners and contained commingled funds from the Receivership Entities and other third party entities. Illarramendi used these accounts as an extension of the Fraudulent Scheme that began at HVP Partners.

45.     HPA was incorporated in Panama in July 2005 and was dissolved in May 2008. In August 2005, HVP Partners was provided with full Power of Attorney over HPA. In 2007, HPA

filed documents to effect a corporate name change from HPA to HIGHVIEWPOINT CST, INC. Bank statements for accounts opened in the name of HPA (the "HPA Account") were addressed to the HVP Partners' office in Stamford, Connecticut. In order to effectuate transactions using the HPA Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to HPA's bank. In these wire authorization letters, Illarramendi referred to the HPA Account as "our" (i.e. HVP Partners) bank account. Thus, the HPA Account was, in reality, an HVP Partners bank account opened under a false name.

46.     Naproad was also incorporated in Panama in July 2005 and was dissolved in May 2008. In September 2005, HVP Partners was provided with full Power of Attorney over Naproad. In 2007, Naproad filed documents to effect a corporate name change from Naproad to HPP INTERNATIONAL S.A. Bank statements for accounts opened in the name of Naproad (the "Naproad Account") were addressed to the HVP Partners' office in Stamford, Connecticut. In order to effectuate transactions using the Naproad Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to Naproad's bank. In these wire authorization letters, Illarramendi referred to the Naproad Account as "our" (i.e. HVP Partners) bank account. Thus, the Naproad Account was, in reality, an HVP Partners bank account opened under a false name.

## THE TRANSACTIONS ASSOCIATED WITH DEFENDANTS

47.     The Receiver's investigation to date has revealed that Defendants received at least four direct transfers totaling at least $28,505,425, consisting of monies extensively commingled and otherwise misappropriated from the Receivership Estate. The Defendants received these transfers directly through Horion. *See* Exhibit A.

48.     The Receiver's investigation has revealed nothing of equivalent value to the Receivership Entities in exchange for these transfers. No value, services, or other consideration

were provided by Defendants in return for the receipt of payments that unjustly enriched Defendants. Defendants knew or should have known that receiving transfers for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund.

49.     Specifically, on May 8, 2009, Illarramendi caused MKV to transfer $6,957,000 from MKV's account with Morgan Stanley Wealth Management to JP Morgan Chase in New York for ultimate credit to Horion's account at Banque Audi (Suisse) SA. *See* Exhibit A.

50.     On May 14, 2009, Illarramendi caused MKV to transfer $5,795,000 from MKV's account with Morgan Stanley Wealth Management to JP Morgan Chase in New York for ultimate credit to the same Horion bank account at Banque Audi (Suisse) SA. *See* Exhibit A.

51.     On June 22, 2009, Illarramendi caused MKV to transfer $11,064,825 from MKV's account with Deutsche Bank Amsterdam to JP Morgan Chase in New York for ultimate credit to the same Horion bank account at Banque Audi (Suisse) SA. *See* Exhibit A.

52.     On July 1, 2009, Illarramendi caused MKV to transfer $4,688,600 from MKV's account with Deutsche Bank Amsterdam to JP Morgan Chase in New York for ultimate credit to the same Horion bank account at Banque Audi (Suisse) SA. *See* Exhibit A.

53.     The Receiver's investigation has not revealed any value provided by Horion in return for these transfers.

### THE NATURE OF THE CAUSES OF ACTION AGAINST DEFENDANTS

54.     At all times relevant hereto, the Receivership Entities, including all of their affiliated entities and funds, were insolvent in that: (i) their liabilities exceeded the value of their assets by millions of dollars; (ii) they could not meet their obligations as they came due; and/or (iii) at the time of the Transfers to Defendants described herein, the Receivership Entities were left with insufficient capital to pay their investors and/or creditors.

55.     This action is being brought to recover misappropriated investor money and Receivership property of the Receivership Entities that was spent on fraudulent transfers made to Defendants, as well as damages for unjust enrichment, so that these funds can be returned and equitably distributed among the investors and creditors of the Receivership Entities.

56.     Without regard to the extent to which they knew of Illarramendi's Fraudulent Scheme, Defendants knew or should have known that they were not entitled to the Transfers or anything else of value. Defendants' actions, in concert with Illarramendi, perpetuated and helped conceal the Fraudulent Scheme and deepened the insolvency of the Receivership Entities.

57.     At all relevant times, Illarramendi was involved in the Fraudulent Scheme with the transfers he made designed to hinder, delay or defraud creditors and continue to conceal his fraudulent conduct.

58.     To the extent that any of the recovery counts below may be inconsistent with each other, they are to be treated as pleaded in the alternative.

59.     All of the Transfers alleged herein are set forth on Exhibit A hereto and the Receiver reserves his right to seasonably amend and revise this schedule.

### FIRST CAUSE OF ACTION
### CUFTA SECTION 52-552e(a)(1) (ACTUAL FRAUD)

60.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

61.     The Transfers were made on or within four years before the date of this action.

62.     Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities improperly caused by Illarramendi in furtherance of the Fraudulent Scheme, within the meaning of section 52-552(b)(12) of CUFTA.

63.     Each of the Transfers occurred during the course of the Fraudulent Scheme, when Illarramendi diverted and misappropriated the Receivership Entities' corporate assets and commingled investor money among the insolvent Receivership Entities. Illarramendi thus directed the Transfers through the Receivership Entities at a time when such entities were insolvent. Accordingly, at all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

64.     At all relevant times, the Receivership Entities were "creditors" of Illarramendi and his accomplices within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

65.     Each of the Transfers was made to, or for the benefit of, Defendants.

66.     Each of the Transfers was made without the Receivership Entities receiving reasonably equivalent value from Defendants.

67.     Each of the Transfers were made by Illarramendi and others through the Receivership Entities to further the Fraudulent Scheme and was made with the actual intent to hinder, delay or defraud the Receivership Entities and some or all of the Receivership Entities' then-existing creditors.

68.     The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(1) of CUFTA and recoverable from Defendants pursuant to section 52-552h of CUFTA.

69.     As a result of the foregoing, pursuant to sections 52-552e(a)(1) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estate.

## SECOND CAUSE OF ACTION
## <u>CUFTA SECTION 52-522e(a)(2) (CONSTRUCTIVE FRAUD)</u>

70.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

71.    The Receiver seeks to avoid those Transfers that were made on or within four years before the date of this action.

72.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552b(12) of CUFTA.

73.    Each of the Transfers occurred during the course of a Ponzi scheme, when Illarramendi diverted and misappropriated the Receivership Entities' corporate assets and commingled investor money among the insolvent Receivership Entities. Illarramendi thus directed the Transfers through the Receivership Entities at a time when such entities were insolvent. Accordingly, at all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

74.    At all relevant times, the Receivership Entities were "creditors" of Illarramendi and his accomplices within the meaning of section 52-552b(4) of CUFTA for the various Transfers alleged herein.

75.    Each of the Transfers was made to, or for the benefit of, Defendants.

76.    Each of the Transfers was made without receipt of reasonably equivalent value from Defendants.

77.    At the time of each of the Transfers, the Receivership Entities were insolvent, were engaged in a business or transaction, or were about to engage in a business or a transaction, for which any property remaining with the Receivership Entities was an unreasonably small capital.

78.     At the time of each of the Transfers, the Receivership Entities intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

79.     The Transfers were not made by the Receivership Entities in the ordinary course of business.

80.     The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(2) of CUFTA and recoverable from Defendants pursuant to section 52-552h of CUFTA.

81.     As a result of the foregoing, pursuant to sections 52-552e(a)(2) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four-years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

### THIRD CAUSE OF ACTION
### CUFTA SECTION 52-522f(a) (CONSTRUCTIVE FRAUD)

82.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

83.     The Receiver seeks to avoid those Transfers that were made on or within four years before the date of this action.

84.     Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552b(12) of CUFTA.

85.     Each of the Transfers occurred during the course of a Ponzi scheme, when Illarramendi diverted and misappropriated the Receivership Entities' corporate assets and commingled investor money among the insolvent Receivership Entities. Illarramendi thus

directed the Transfers through the Receivership Entities at a time when such entities were insolvent. Accordingly, at all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

86.    At all relevant times, the Receivership Entities were "creditors" of Illarramendi and his accomplices within the meaning of section 52-552b(4) of CUFTA for the various Transfers alleged herein.

87.    Each of the Transfers was made to, or for the benefit of, the Defendants.

88.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

89.    At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

90.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552f(a) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

91.    As a result of the foregoing, pursuant to sections 52-552f(a) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

**FOURTH CAUSE OF ACTION**
**<u>UNJUST ENRICHMENT</u>**

92.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

93.     Defendants benefited from the receipt of money provided by Illarramendi through the Receivership Entities in the form of payments and other Transfers alleged herein which were the property of the Receivership Entities and their investors, and for which Defendants did not adequately compensate the Receivership Entities or provide value.

94.     Defendants unjustly failed to repay the Receivership Entities for the benefits received from the Transfers.

95.     The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of the Receivership Entities' creditors.

96.     Equity and good conscience require full restitution of the monies received by Defendants from the Receivership Entities for distribution to the creditors.

97.     Defendants' conscious, intentional, and willful tortious conduct alleged herein entitles the Receiver to recapture monies received by Defendants from Illarramendi through the Receivership Entities.

98.     By reason of the above, the Receiver, on behalf of the Receivership Entities and its creditors, is entitled to an award in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**<u>CONVERSION</u>**

99.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

100.    The Receivership Entities had a possessory right and interest to their assets.

101.    Each of the Transfers occurred during the course of a Ponzi scheme, when Illarramendi diverted and misappropriated the Receivership Entities' corporate assets and commingled investor money among the insolvent Receivership Entities. Accordingly, at all relevant times herein, the Transfers were unauthorized.

102.     The Defendants converted the assets of Receivership Entities when they received money originating from Receivership Entities. These actions deprived the Receivership Entities and their creditors of the use of this money.

103.     As a direct and proximate result of this conduct, the Receivership Entities and their creditors have not had the use of the money converted by the Defendants.

104.     By reason of the above, the Receiver, on behalf of the Receivership Entities, is entitled to an award of compensatory damages in an amount to be determined at trial.

105.     Defendants' conscious, willful, wanton, and malicious conduct entitles the Receiver, on behalf of the Receivership Entities and their creditors, to an award of punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## ACCOUNTING

106.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

107.     As set forth above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, unjust enrichment, money had and received, and other wrongdoing of the Defendants for their own individual interests and enrichment.

108.     The Receiver has no adequate remedy at law.

109.     To compensate the Receivership Entities for the amount of monies Defendants diverted from Receivership Entities for their own benefit, it is necessary for Defendants to provide an accounting of any transfer of funds, assets, or property received from the Receivership Entities, as well as to any monies received in the past and on a going forward basis in connection with Receivership Entities. Complete information regarding the amount of such

transfers misused by Defendants for their own benefit is within their possession, custody, and control.

**SEVENTH CAUSE OF ACTION**
**MONEY HAD AND RECEIVED**

154.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

155.    Defendants received money from the Receivership Entities in the form of the Transfers and other payments, as alleged herein, which were the property of the Receivership Entities and their investors, and for which Defendants did not adequately compensate the Receivership Entities or provide value.

156.    Defendants benefited from receipt of this money.

157.    The Receivership Entities had no legal or moral obligation to make any such Transfers or other payments.

158.    Defendants possess money to which they are not entitled and in good conscience have no right to retain.

159.    The receipt and possession of this money by Defendants was at the expense of the Receivership Entities and, ultimately, at the expense of the Receivership Entities' creditors.

160.    Equity and good conscience require full restitution of the monies received by Defendants from the Receivership Entities for distribution to the creditors.

161.    By reason of the above, the Receiver, on behalf of the Receivership Entities and their creditors, is entitled to an award in an amount to be determined at trial.

**WHEREFORE**, the Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against Defendants as follows:

i.      On the First Cause of Action, pursuant to sections 52-552e(a)(1) and 52-552h of the Connecticut Uniform Fraudulent Transfers Act: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estate;

ii.     On the Second Cause of Action pursuant to sections 52-552e(a)(2) and 52-552h of the Connecticut Uniform Fraudulent Transfer Act: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from Defendants for the benefit of the Receivership Estate;

iii.    On the Third Cause of Action pursuant to sections 52-552f(a) and 52-552h of the Connecticut Uniform Fraudulent Transfer Act: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from Defendants for the benefit of the Receivership Estate;

iv.     On the Fourth Cause of Action against Defendants for unjust enrichment and for damages in an amount to be determined at trial;

v.      On the Fifth Cause of Action against Defendants for conversion an award of compensatory damages in an amount to be determined at trial and an award of punitive damages in an amount to be determined at trial;

vi.     On the Sixth Cause of Action against Defendants for an accounting of any transfer of funds, assets, or property of the Receivership Entities; and

vii.    On the Seventh Cause of Action against Defendants for money had and received, for damages in an amount to be determined at trial.

viii.    On all Causes of Action, awarding the Receiver all applicable pre-judgment and post-judgment interest, costs, and disbursements of this action; imposition of a constructive trust upon any transfer of funds, assets, or property received from the Receivership Entities; and such other, further, and different relief as the Court deems just, proper and equitable.

The Receiver respectfully requests a jury trial for all of the preceding causes of action.

Date: May 8, 2013                                   /s/ Ona T. Wang
                                                    **BAKER HOSTETLER LLP**

                                                    Ona T. Wang
                                                    45 Rockefeller Plaza
                                                    New York, NY 10111
                                                    Tel: (212) 589-4200
                                                    Fax: (212) 589-4201
                                                    Ona T. Wang
                                                    Email: owang@bakerlaw.com

                                                    *Attorneys for Receiver John J. Carney, Esq.*

OF COUNSEL
**BAKER HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
Naima J. Garvin
Email: ngarvin@bakerlaw.com
Kendall E. Wangsgard
kwangsgard@bakerlaw.com